# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

| | | |
|---|---|---|
| **CHARLES H. BARNETT,** | ) | |
| Petitioner/Appellee, | ) | Madison Probate No. 97-11128 |
| **v.** | ) | Appeal No. W1998-00837-COA-R3-CV |
| **JUSTIN OLIVER, CHRISTOPHER TYLER YOUNG, LEWIS COBB, CHRISTY YOUNG, SPRAGGINS, BARNETT, COBB & BUTLER,** | ) | |
| Defendants, | ) | |
| and | ) | |
| **T. A. OLIVER, MARTHA YOUNG, and MRS. OZELL D. OLIVER,** | ) | |
| Defendants/Appellants. | ) | |

**FILED**

**February 17, 2000**

**Cecil Crowson, Jr.
Appellate Court Clerk**

APPEAL FROM THE PROBATE COURT OF MADISON COUNTY
AT JACKSON, TENNESSEE

THE HONORABLE LARRY J. LOGAN, JUDGE

For the Petitioner/Appellee:

T. J. Emison, Jr.
Alamo, Tennessee

For the Defendants/Appellants:

Charles A. Sevier
Memphis, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This is a lost will case. The decedent properly executed a will. The will was not found after the decedent's death. A beneficiary under the will petitioned the probate court to establish a copy of the will as the decedent's last will and testament. The decedent's family objected, arguing that the decedent had revoked the will. The probate court entered an order admitting the copy of the will to probate. The decedent's family appeals. We affirm, holding that the plaintiff beneficiary has established that the decedent neither revoked nor destroyed the will.

Kenneth Wayne Oliver ("Decedent") was a meticulous and organized person in his business affairs. Though hampered by a debilitating back condition, witnesses testified that the Decedent was a "very astute business person" and that he was "fastidious" in his business dealings. The Decedent also kept his house in an extremely neat and orderly condition. Witnesses testified that the Decedent's house was "immaculate" and "very organized". One witness characterized the Decedent's attention to detail as "almost obsessive-compulsive."

In July 1992, the Decedent asked Wes Clayton ("Clayton"), an attorney in Jackson, Tennessee, to draft a new will for him. The Decedent had kept a will continuously since 1982. In the ten years following 1982, the Decedent executed six more wills. During that time, he never went more than three years without a new will. The Decedent's will executed in 1985 was revoked by written revocation, and each of the Decedent's subsequent wills was revoked by specific language in the following will. In 1989, the Decedent also executed a living will.

In accordance with the Decedent's instructions, Clayton drafted the Decedent's will to include specific bequests to several of the Decedent's family members and to leave the Decedent's residuary estate to his attorney, Charles Barnett ("Barnett"). Barnett was also appointed personal representative under the will. The will was properly signed and witnessed on July 31, 1992, and Clayton gave the executed will to the Decedent on that day. Clayton kept an unsigned copy of the will at his office.

On the day the will was executed, the Decedent told Clayton that Barnett was his best friend and that he wanted to name Barnett in his will. Barnett had represented the Decedent in a variety of legal matters since 1979. Though one witness testified that the Decedent's relationship with Barnett had begun to sour before the Decedent's death, the probate court heard substantial evidence that the Decedent trusted Barnett and wished to provide for him after the Decedent's death. The Decedent gave Barnett durable power of attorney in 1991, and in 1995 the Decedent reaffirmed his desire that Barnett retain the durable power of attorney. In 1995, the Decedent also made Barnett a joint owner with right of survivorship on his checking account and on his stock brokerage account. In addition, the Decedent gave Barnett a key and access to his safety deposit box. The Decedent purchased savings bonds payable on his death to Barnett. In January 1997, the Decedent purchased a life insurance policy worth $3,000 which named Barnett as the sole beneficiary. In 1997, the

Decedent told two employees at his broker's office, Brad Sipes and Allison Buckley, that "he was leaving [Barnett] everything" when he died.

The Decedent told several people the location of his will so that it could be found if something happened to him. Russell Wright ("Wright"), a friend of the Decedent, testified that the Decedent asked him to come to his house before trips the Decedent took in 1993 and 1995. Wright testified that the Decedent took him to his home office, opened his file cabinet, lifted a legal-size envelope, and stated "This is my will. In the event something should happen to me, I want you to know where this is." In approximately March or April 1997, the Decedent told another friend, Betty Wilson, that he kept his will in his home office. Finally, Ron Kerber, the Decedent's nephew, and Kerber's girlfriend, Tina Jones, testified that they saw a document titled "Will" in a briefcase the Decedent carried on a trip that they took with the Decedent months before the Decedent's death.

Under the Decedent's July 1992 will, he did not name his mother, Ozell Oliver, as a beneficiary. Ms. Oliver was eighty-eight years old and in poor health when the Decedent executed his will. A witness at the trial testified that the Decedent told him that he did not intend to leave his mother anything because he did not believe that she needed anything from his estate. After receiving money from another estate, Ms. Oliver had distributed the money she received to the Decedent and her other children.

The Decedent had eight brothers and sisters. Most of the Decedent's siblings did not benefit under the July 1992 will; however, the will bequeathed certain items to two of the Decedent's brothers, Justin Oliver and T.A. Oliver. The will also bequeathed all of the Decedent's personal property to one of his sisters, Martha Young. The Decedent had indicated that he was not close to some of his family members and said that they had "never done anything for [him]." He expressed concern that his brothers and sisters would try to take all of his estate if he died.

Three of the Decedent's siblings who did not benefit under the July 1992 will testified that they had a close relationship with the Decedent. Telephone records showed several long-distance phone calls from the Decedent's house to family members who lived outside of Tennessee. Two of the sisters, Mary Garrett and Rose Neri, testified that the Decedent became angry with them only when they tried to talk to him about his use of prescription back pain medications.

Witnesses testified about the Decedent's fondness for his nephew, Rocky Young. Rocky Young died in an automobile accident in 1987. After his nephew's death, the Decedent looked after Rocky Young's wife, Christy Young, and his son, Christopher Tyler Young. The July 1992 will bequeathed items of the Decedent's personal property to Christy and Christopher Tyler Young.

Most of the Decedent's family lived outside of Tennessee, but his sister Martha Young lived near the Decedent in Jackson, Tennessee. When he suffered from back pain, the Decedent depended on assistance from Ms. Young as well as a number of friends and neighbors. In his last years, the

2

Decedent gave keys to his house to several persons, presumably so that they would be able to enter the house if the Decedent needed help. Several people were aware that the Decedent kept a spare house key in a tool shed outside his home.

On May 13, 1997, the Decedent entered the hospital with a serious illness. It soon became apparent that the Decedent's condition was terminal. At this point, his sister Martha Young moved into the Decedent's home and began to contact family members who lived outside of Tennessee. Martha Young and another sister, Jean Boston, stayed at the Decedent's house until the day of his funeral. In the days before Decedent's funeral, Martha Young removed legal documents and other records in the Decedent's filing cabinet, a briefcase, and other items of personal property from his house.

The Decedent died on June 18, 1997. Soon after his death, the family went to the Decedent's house to search for his will. They had also been told that the Decedent had hidden significant amounts of cash around the house. Neither the will nor the cash was found. Family members remarked that the house was not in the neat condition in which the Decedent normally kept it. T.A. Oliver testified that it looked as though "someone had been through the house." The Decedent's family collected all of the Decedent's property and divided it among themselves.

At the Decedent's funeral, a business associate of the Decedent, Steve Foster ("Foster"), told the Decedent's family that, in January 1997, the Decedent had asked him to serve as executor of his estate. Foster agreed to act as executor, but the Decedent never talked with Foster about the matter again. At the trial, Ron Kerber testified that he overheard his aunt, Martha Young, state at the funeral that she knew the contents of the Decedent's will. Martha Young denied having made the statement.

On May 29, 1997, Barnett petitioned the probate court to establish Clayton's copy of the Decedent's July 1992 will as the Decedent's last will and testament. Justin Oliver and several of the Decedent's other family members ("Olivers") opposed admission of the will to probate.

After the hearing, the probate court entered an order admitting the copy of the July 1992 will to probate as Decedent's last will and testament. In the order, the probate court stated that the only contested issue in the case was whether the Decedent had revoked the July 1992 will. It found the evidence overwhelming that the Decedent had not revoked the will. The probate court noted that it would have been "totally out of character" for the Decedent to die without a will. In addition, the Decedent had always revoked his previous wills by written document. The probate court found the weight of the evidence inconsistent with the Olivers' assertion that the Decedent would have revoked his will without having a valid will to replace it.

The probate court observed that the Decedent had a will beginning in 1982 and that he had kept a will since that time. The Decedent told several people that he had a will, and expressed

desires concerning the final disposition of his property consistent with the July 1992 will. The Decedent also showed several persons where he kept his will in his house.

The probate court noted that virtually every witness in the case testified that the Decedent had enjoyed a long and close friendship with Barnett. The Decedent took substantial steps to ensure that Barnett was provided for financially after the Decedent's death. The probate court found that Barnett had "basically . . . become family" to the Decedent and that, as such, he would have been the natural object of the Decedent's bounty. In contrast, the probate court observed that there had been occasional friction between the Decedent and his family. The probate court credited Ron Kerber's testimony that he heard Martha Young, an opponent to the admission of the July 1992 will, state at the Decedent's funeral that she knew of the will's existence and of its contents, and accorded Kerber's testimony additional weight in light of Kerber's relationship to Martha Young.

The probate court commented that several persons had access to the Decedent's home and that several also knew that the Decedent kept significant amounts of cash hidden in his home. The probate court expressed its belief that someone with confidential knowledge and access to the Decedent's home entered the home between the time the Decedent went to the hospital and the time of his death and took the Decedent's cash and his will.

The probate court concluded that the evidence, taken as a whole, clearly showed that the Decedent did not revoke the July 1992 will before he died. Therefore, the copy of the July 1992 will was admitted to probate as the Decedent's last will and testament. From this order, the Olivers now appeal.

On appeal, the Olivers argue that Barnett failed to carry his burden of proof that the Decedent did not revoke or destroy the July 1992 will. The Olivers assert that the fact that the Decedent asked Foster to serve as the executor of his estate establishes that the Decedent revoked the July 1992 will. They also argue that the Decedent named Barnett as beneficiary of the insurance policy as consolation for revoking the July 1992 will. The Olivers maintain that this evidence demonstrates that the Decedent likely revoked the July 1992 will but died before he could execute a new will. The Olivers assert that Barnett failed to prove that the July 1992 will was accidently lost or fraudulently destroyed against the Decedent's wishes.

Since this case was tried by the probate court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. *See* Tenn.R.App.P. 13(d).

In order to establish a lost will, the proponent of the will must show (1) that the testator executed a valid will, (2) the substance and contents of the will, (3) that the testator died, (4) that the testator did not revoke the will, and (5) that the will cannot be found after a diligent search. *See* *Shrum v. Powell*, 604 S.W.2d 869, 871 (Tenn. Ct. App. 1980) (citing *Moore v. Williams*, 207

S.W.2d 590, 591 (Tenn. Ct. App. 1947)). These elements must be proven by "the clearest and most stringent evidence." *Shrum*, 604 S.W.2d at 871.

When a will cannot be found after a due and proper search following the testator's death, the testator is presumed to have destroyed his will. *See In re Estate of West*, 729 S.W.2d 676, 678 (Tenn. Ct. App. 1987). The proponent seeking to establish a lost will may overcome the presumption by proving that the testator did not have custody and control of the will after execution. *See id.*

It is not sufficient for the proponent of a lost will to show merely that persons interested in establishing intestacy had an opportunity to destroy the will. *See Moore*, 207 S.W.2d at 591. The proponent must show by facts and circumstances that the will was fraudulently destroyed or accidently lost not in accord with the testator's wishes. *See id.*

In this case, there is no dispute that the Decedent executed a valid will in July 1992, that Clayton retained an exact copy of the will, that the Decedent died, and that no will could be found among the Decedent's possessions after his death. Therefore, the only issue at trial, and for this Court on appeal, is whether the Decedent revoked or destroyed the July 1992 will.

As noted by the probate court, the Decedent was a meticulous person who took significant steps to ensure that he would have a valid will in place when he died. He executed his first will in 1982, and executed seven more wills in the fifteen years that followed. The Decedent's practice was to revoke his prior wills by a written instrument; however, there is no written revocation of his July 1992 will. The Decedent kept his will in a filing cabinet in the office in his house and told several people the location of the will so that it could be found when he died. Witnesses testified that the Decedent even carried his will with him on trips in a briefcase.

The Decedent's verbal statements concerning the final disposition of his property were consistent with the terms of the July 1992 will. In January 1997, five months before he died, the Decedent told two persons that he was "leaving [Barnett] everything." The Decedent had a good relationship with certain members of his family, but he expressed fear that some of his relatives would try to take all of his property after his death. The July 1992 will bequeaths property to family members with whom the Decedent shared a close relationship. The Decedent had a good relationship with his mother, and she is not named in the July 1992 will. However, the evidence indicated that the Decedent felt that his mother did not need any money from his estate.

Finally, several persons had access to the Decedent's home during his life as well as after his death. Numerous persons had keys to the Decedent's house or knew the location of his spare key. Some members of the Decedent's family moved into the house after the Decedent entered the hospital. After Decedent's death, his house was described as being in disarray, uncharacteristic of the Decedent, and both his will and the cash he had hidden around the house were missing. The record contains no direct proof that one of the family members took the will. However, evidence

indicated that Martha Young removed legal documents and a briefcase from the Decedent's house after he entered the hospital. Young's nephew, Ron Kerber, testified that he heard Ms. Young state at the Decedent's funeral that she knew the contents of the Decedent's will. The probate court noted its favorable evaluation of the nephew's credibility. The trial judge, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to assess the truthfulness of witnesses. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). We must, therefore, accord great weight to the probate court's determinations of credibility. *See id*.

In this case, Barnett must carry a high burden of proof; he must establish that the Decedent did not revoke his will by "the clearest and most stringent evidence." *Shrum*, 604 S.W.2d at 871. Since the will cannot be found, Barnett is required to overcome the presumption that the Decedent destroyed his will. *See In re Estate of West*, 729 S.W.2d at 678. There is no direct evidence that the Decedent did not revoke or destroy his will. However, considering all of the circumstantial evidence and according great weight to the probate court's determinations of credibility, we find that the burden of proof has been met that the will was neither revoked nor destroyed. Accordingly, the probate court's decision to admit to probate the Decedent's July 1992 will is affirmed.

The decision of the probate court is affirmed. Costs are assessed against the Appellants, T. A. Oliver, Martha Young and Mrs. Ozell D. Oliver, for which execution may issue if necessary.

 

 

_____
**HOLLY KIRBY LILLARD, J.**

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**ALAN E. HIGHERS, J.**